19-MJ-5251-JGD

## AFFIDAVIT OF JAMES KECZKEMETHY
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent James Keczkemethy, being duly sworn, depose and state that:

1. I am a Special Agent employed by the Drug Enforcement Administration ("DEA"), and have been so employed since May 11, 2018. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of the federal narcotics laws in Title 21 of the United Stated Code. Prior to my employment with DEA, I was a Police Officer in Hartford, Connecticut for over six years and was responsible for enforcing State of Connecticut motor vehicle and criminal laws; including but not limited to, narcotic violations.

2. During my law enforcement career I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846. Many of those investigations resulted in arrests, indictments and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles and the forfeiture of personal property. My investigations have included the use of surveillance techniques, tracking warrants, and the execution of search, seizure and arrest warrants. I have participated in various aspects of narcotics investigations, including controlled and undercover purchases. Based on my training and experience, I am familiar with the appearance, packaging, and texture of many controlled substances.

3. As a result of my training and experience, I am familiar with the methods, routines, and practices of individuals involved in the use, sale and trafficking of narcotics. I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver,

1

and dispense, import and export, and use controlled substances such as methamphetamine, fentanyl, heroin, cocaine, marijuana, prescription medications, and others. I have debriefed numerous defendants, informants, and witnesses who have had personal knowledge about drug activities and the operation of drug trafficking organizations. I have sworn out numerous affidavits in support of search warrants, arrest warrants, and other Court applications.

### PURPOSE OF THE AFFIDAVIT

4.  I submit this affidavit for two reasons. First, this affidavit is being submitted in support of an application for a criminal complaint charging that, from in or about May 2019 to the present, in Lawrence and elsewhere in the District of Massachsuetts, Ronyel PENA (hereinafter, "PENA") and Jose MARTINEZ (hereinafter, "MARTINEZ") (collectively, the "Targets") conspired to distribute and possess with intent to distribute a mixture and substance containing N-phenyl-N-[ 1-(2-phenylethyl)-4-piperidinyl ] propanamide, also known as fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846. Second, I submit this affidavit in support of the government's motion that the Targets be detained pending trial. Based on the information set out below, the Targets represent a danger to the community or pose a significant risk of flight (or both).

5.  I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the DEA and other federal, state, and local law enforcement agencies. This affidavit does not set forth all of the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Targets committed the offense set forth in the accompanying criminal complaint.

**Background of the Investigation**

6. In or about the spring of 2019, the DEA began an investigation into a drug trafficking organization ("DTO") in the Lawrence, Massachusetts area. Through that investigation, agents obtained the cellular telephone number (hereinafter, the "Target Telephone") of an unidentified drug distributor, known only as "Jay," and learned that "Jay" would accept drug orders via text message. Through subsequent investigation, agents believe that "Jay" is actually Jose MARTINEZ.

### April 29, 2019 Sample of Suspected Fentanyl Acquired

7. During the week of April 28, 2019, an undercover DEA agent (hereinafter, the "UC"), contacted (978) 566-8832 (the "Target Telephone") to order fentanyl. On April 29, 2019, the Target Telephone sent the UC a text message telling the UC, "Come to 104 Hancock in Lawrence." Prior to the meeting, the UC was equipped with an audio/video recording device.

8. At approximately 1:16 p.m., the UC arrived on Hancock Street in Lawrence, Massachusetts. Shortly after arriving, the UC received a text message from the Target Telephone instructing the UC to walk towards the dumpster. After doing so, the UC was approached by a Hispanic male, approximately 18-21 years of age, riding a skateboard. The male handed the UC two plastic bags containing approximately two grams of a tan/off white powder believed to be fentanyl.

9. Agents sent the suspected fentanyl to the DEA Northeast Regional Laboratory for testing. The results are pending.

### May 6, 2019 Controlled Purchase of 20 Grams of Suspected Fentanyl

10. On May 6, 2019, the UC sent a text message to the Target Telephone, stating "There in 20. Need 2 for 400 this time…" "Jay" confirmed the quantity and the price via text

message, and told the UC to meet him at 104 Hancock Street in Lawrence, Massachusetts. Based on my training and experience, I understand that "2" was a reference to two "fingers," or 20 grams. Prior to meeting with "Jay" or his associate, the UC was equipped with an audio/visual recording device.

11. At approximately 2:00 p.m., the UC sent several text messages to the Target Telephone to let "Jay" know that the UC was at the meeting location. The UC observed a Hispanic male, with a tight cropped beard, in the area of the pre-determined meet location. The individual was later identified as PENA. PENA provided the UC with a plastic bag of 20 grams of suspected fentanyl, and the UC provided PENA with $400 in official agency funds. The bag was tied off in a knot and contained a tan/off white powder. Based on my training and experience, this investigation and the appearance of the substance, I believe the tan/off white powder to be fentanyl.

12. Following the transaction, PENA walked away and the UC returned to the UC vehicle and departed the area to the DEA office. Agents sent the suspected fentanyl to the DEA Northeast Regional Laboratory for further testing. The results are pending.

### June 17, 2019 Controlled Purchases of 90 Grams of Suspected Fentanyl

13. On June 17, 2019, the UC sent a text message to the Target Telephone to arrange for a controlled purchase of 50 grams of suspected fentanyl for $1,000. The UC received a text message from the Target Telephone directing him to meet at "30 cedar st." Prior to the controlled purchase, the UC was fitted with an audio/video recording device.

14. At approximately 2:17 p.m., the UC arrived in the area of Cedar Street, in the vicinity of Cross Street in Lawrence. Shortly thereafter, the UC received a phone call from the Target Telephone advising him that the individual who would deliver the suspected fentanyl was

approximately seven minutes away. Approximately, fifteen minutes later, the UC received another call from the Target Telephone directing him to leave his vehicle, walk towards Chardon Street, and retrieve the product from a wheel rim of a black Dodge that was parked on Chardon Street. Approximately one minute later, agents conducting surveillance observed PENA, on the front porch of 22 Chardon Street, in Lawrence (hereinafter, "22 Chardon Street"). PENA watched the UC walk up Chardon Street and back onto Cedar Street. PENA exited the porch at 22 Chardon Street and approached the UC's location. The UC approached PENA and PENA handed the UC a plastic bag containing a tan/off white powder substance believed to be fentanyl. The UC then handed PENA $1,000 in official agency funds. Surveillance then observed PENA walk back to 22 Chardon Street and enter the rear door.

15. Shortly thereafter, the UC sent a text message to the Target Telephone stating, "Might have a customer for you later today." The UC instantly received a text message from the Target Telephone in response, stating, "Ok sounds good." Over the course of the next thirty minutes, the UC and the Target Telephone exchanged text messages and phone calls, all of which were recorded, to arrange for the UC to purchase an additional 40 grams of suspected fentanyl. They agreed that the UC would pay $300 for 10 grams and that "Jay" would provide an additional 30 grams that the UC would pay $600 for at a later date.

16. At approximately 3:21 p.m., the UC received a text message from the Target Telephone directing the UC, "Go to Hudson ave bottom of the hill." Shortly thereafter, the UC arrived at that location. Agents observed PENA arrive in a black Dodge Durango. PENA approached the UC and entered the front passenger door of the UC vehicle. The UC handed PENA $300, and PENA handed the UC a clear plastic bag tied with a knot containing two additional clear plastic bags, each containing a tan/off white powder substance believed to be

fentanyl. The total weight of the suspected fentanyl was approximately 40 grams. PENA exited the UC vehicle and got into the passenger seat of the Dodge Durango. Surveillance agents observed the Dodge Durango travel back to 22 Chardon Street. Agents then observed PENA standing on the rear stairs at 22 Chardon Street speaking with three as-yet unidentified Hispanic males. Shortly thereafter, the men went into 22 Chardon Street.

17. Agents sent the 90 grams of suspected fentanyl purchased from "Jay" and delivered by PENA during the two meetings on June 17, 2019 to the DEA Northeast Regional Laboratory for testing. The results are pending.

### June 27, 2019 Controlled Purchase of Suspected Fentanyl

18. On June 27, 2019, the UC sent a text message to the Target Telephone to arrange for another controlled purchase of fentanyl. The two agreed that the UC would purchase 70 grams of suspected fentanyl in exchange for $1,900, as well as pay the $300 owed from the June 17, 2019 second controlled purchase of 40 grams of suspected fentanyl. Prior to the meeting, the UC was equipped with an audio/video recording device.

19. Agents established surveillance in the area of 22 Chardon Street. The UC received a text message from the Target Telephone stating that he would be ready in five minutes. At that time, agents in the area observed PENA enter 22 Chardon Street through the rear door, remain inside for several minutes then leave, and walk towards the UC vehicle, which was parked on Cedar Street.

20. After approaching and entering the UC vehicle, PENA was detained by agents. Agents retrieved a large baseball sized clear plastic bag containing a tan/off white powder. Based on my training and experience, the investigation to date, and the appearance of the tan/off white powder substance, I believe the substance contains fentanyl.

21. After PENA was detained, agents placed a call to the Target Telephone. An unidentified male answered the Target Telephone and dogs were heard barking loudly in the background. Agents then approached the Target Location, and knocked loudly on both the front and rear entry door, with no response. Agents heard the dogs barking in response to the loud knocking. The barking appeared to be similar to the dogs heard barking in the background when agents called the Target Telephone earlier that day. Agents observed cameras in multiple locations, and that the windows to the first floor were covered with what appeared to be either heavy blinds or garbage bags. Agents then went up exterior stairs to the entrance to the second floor unit and knocked on the door. Agents spoke with the occupants of the second floor, who stated that the occupants of the first floor had moved in recently. Agents went back down to the rear door of the first floor unit, knocked loudly again, and heard movement from inside the apartment. Out of concern for the potential destruction of evidence, agents forced entry to the first floor unit and secured the area pending authorization to search.

22. Upon entering the first floor unit, agents encountered two male individuals. As agents entered the unit, a third male individual MARTINEZ fled through a window and ran down the street. Agents in the perimeter of 22 Chardon Street were able to detain MARTINEZ a short distance away. Once detained, agents took MARTINEZ back to 22 Chardon Street pending authorization to search the location.

23. While agents waited for authorization to search 22 Chardon Street, and after advising the men of their *Miranda* rights, agents identified the men as: Jose MARTINEZ, Luis RUYNOSO, and Jhamyl FRICAS.

24. After being informed of his rights, and acknowledging that he understood his rights, FRICAS agreed to speak with agents. FRICAS told agents that he is an acquaintance of

MARTINEZ. He also identified MARTINEZ as "Jay," and said, "that's your guy." FRICAS told agents that, at one point, one of the men received a telephone call from his girlfriend, who informed him that PENA had been arrested. FRICAS reported that not long after that, they heard someone knocking loudly on the door. At that point, MARTINEZ told FRICAS to go into the bedroom and wait. FRICAS told agents that he saw MARTINEZ carrying several bags of white powder and green capsules (pills), and that MARTINEZ was walking towards the bathroom. He described the bags as larger than a baseball, but smaller than a softball. FRICAS also told agents that while he was in the bedroom he heard MARTINEZ flushing the toilet repeatedly and a lot of running around in the apartment. Based on my training and experience and the investigation, I believe MARTINEZ was flushing drugs down the toilet.

<u>Search of 22 Chardon Street</u>

25. On June 27, 2019, at 9:25 p.m., United States Magistrate Judge Marianne B. Bowler authorized agents to search the premises at 22 Chardon Street. While searching 22 Chardon Street agents found the following items:

   a. From the basement:

      1) A loaded Kel Tec .556 assault riffle;

      2) A Glock 26 handgun;

      3) A wallet containing a health service card in the name of Jose MARTINEZ; and

      4) A hard drive to a camera security system.

   b. From the master bedroom (that MARTINEZ identified as his room):

      1) Debit card in the name of Jose MARTINEZ;

      2) Three .223 bullets, which match the ammunition found in the Kel Tec .556 assault riffle noted above;

      3) Bullet proof vest with ceramic plates located under the bed;

      4) Gun oil located in the dresser;

      5) Small bag with white powdery substance, believed to be cocaine, located under the bed;

      6) Attachment for a firearm, located under the bed;

      7) Money counter located in a closet;

      8) Power cord to the money counter wrapped up in top right dresser drawer;

      9) Box of baggies;

      10) U.S. currency in pocket of black pants;

      11) Item of clothing in closet with white powder residue; and

      12) Two cellular telephones in the top drawer of the dresser.

   c. From the kitchen:

      1) Two smashed cellular telephones found in the trash can;

      2) Digital scale found in the trash can;

      3) Several wet plastic bags with chunky white residue found in the trash can;

      4) Bottle of lactose and several plastic bags found in cabinet;

      5) Tray to fill pill capsules found in the stove; and

      6) U.S. currency in a small box.

   d. From the bathroom:

      1) Two large plastic bags containing empty green capsules; and

      2) A smashed cellular telephone found in the sink.

26.  After being advised of his *Miranda* rights, MARTINEZ made the following statements: (1) he told agents that the master bedroom was his bedroom; and (2) with respect to the items found in the basement, MARTINEZ said, "You didn't find my wallet with the guns. It was in a suitcase." Agents found a suitcase within approximately 10 feet of the guns. Inside that suitcase was a wallet that contained the health service card with MARTINEZ's name on it.

## CONCLUSION

27.  As noted above, in light of the evidence summarized herein, I submit that there is probable cause that the Targets violated 21 U.S.C. § 846, and I respectfully request that the Targets be detained pending trial.

Signed under the pains and penalties of perjury this 28th day of June 2019.

*James Keczkemethy*
James Keczkemethy
DEA Special Agent

Subscribed and sworn to
before me this 28th day of
June, 2019

*Marianne B. Bowler USMJ*
HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS